IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                    Plaintiff,<br><br><br>vs.<br><br><br>RONALD GAY DOSS,<br>                    Defendant. | MEMORANDUM OPINION AND ORDER<br><br><br><br><br>Case No. 2:05 CR 861 |

Defendant Ronald Gay Doss moves this court for an order suppressing evidence of methamphetamine discovered in his truck following his roadside arrest for driving under the influence of a controlled substance.  Mr. Doss claims that the evidence must be suppressed because Utah Highway Patrol Sergeant Paul Mangelson unconstitutionally expanded the scope of a routine traffic stop for speeding into an investigation of Mr. Doss's potential impairment.  After reviewing all relevant materials, including a videotape of the traffic stop, the court concludes that Sergeant Mangelson had reasonable suspicion to expand the scope of the traffic stop and that Mr. Doss's detention and ultimate arrest did not violate the Fourth Amendment of the United States Constitution.

<u>FACTS</u>

*Sergeant Mangelson's Expertise*

During the course of his nearly forty-year career, Sergeant Mangelson has conducted

thousands of investigations involving intoxicated drivers, including hundreds of investigations of drivers under the influence of controlled substances, such as marijuana.  (Transcript of March 30, 2006 Evidentiary Hearing [hereinafter "Tr."]  4-5.)  Additionally, Sergeant Mangelson has received ongoing and extensive training regarding the physiological effects of controlled substances on the human body.  (Id. at 5-10.)  Sergeant Mangelson is trained to identify physical indicators that suggest use of a controlled substance, and is also trained to perform field tests designed to reveal impairment caused by controlled substances.  (Id.)

*Sergeant Mangelson Stops Mr. Doss for Speeding*

While patrolling Interstate 15 near Nephi, Utah, Sergeant Mangelson observed and clocked, using radar, a Dodge pickup truck traveling eighty-two miles per hour in a seventy-five mile-per-hour zone. (Id. at 11.)  Based on his determination that the truck was speeding, Sergeant Mangelson pulled the truck over.  (Id.)  Mr. Doss was the driver and sole occupant of the truck. (Id.)

After stopping the truck, Sergeant Mangelson got out of his patrol car and approached the truck on the passenger side.  (Id.)  Mr. Doss rolled down the passenger-side window as Sergeant Mangelson approached.  (Id. at 11-12.)  Upon reaching the truck, Sergeant Mangelson asked Mr. Doss for his driver's license and vehicle registration.  (Id. at 11.)

*Sergeant Mangelson Suspects Mr. Doss Is Impaired*

While waiting for Mr. Doss to produce his license and registration, Sergeant Mangelson spoke with Mr. Doss about the reason for the stop and asked routine questions about his travel plans.  (Id. at 12; Gov. Ex. 1.)    As soon as Sergeant Mangelson started talking with Mr. Doss, he observed that Mr. Doss's eyes were pinkish, glassy, and bloodshot.  (Tr. 12-13.)  He also noticed that Mr. Doss had a withdrawn look, which he testified was "maybe a look of a zombie."

2

(<u>Id.</u> at 13.)  Additionally, Sergeant Mangelson testified that Mr. Doss was extremely nervous, much more so than the typical driver stopped for a speeding infraction.  (<u>Id.</u> at 12, 14.)  In fact, Sergeant Mangelson noted that Mr. Doss was talking very fast and appeared to be "much more [nervous] than the normal person."  (<u>Id.</u>)

Sergeant Mangelson was so struck by Mr. Doss's appearance and behavior that he commented on it almost immediately after he began to speak with Mr. Doss.  Specifically, Sergeant Mangelson commented on Mr. Doss's eyes and asked if Mr. Doss had been drinking.  (Gov. Ex. 1.)

Sergeant Mangelson testified that Mr. Doss's pinkish, bloodshot, and glassy eyes, as well as Mr. Doss's withdrawn look, were physical indicators that Mr. Doss was impaired.  (<u>Id.</u> at 6-7, 13.)  Additionally, Sergeant Mangelson testified that, in his experience, heightened levels of nervousness and fear, such as that displayed by Mr. Doss, suggest that an individual is involved in criminal activity, such as driving while impaired or possessing contraband.  (<u>Id.</u> at 14).

Mr. Doss attempted to explain his physical appearance by telling Sergeant Mangelson that he was merely tired because he slept poorly in a motel room the night before and had been driving since 5:30 a.m.  (<u>Id.</u> at 14.)  Sergeant Mangelson concluded that Mr. Doss's condition was much more likely attributable to impairment than to simple fatigue.  (<u>Id.</u> at 15.)  In fact, when asked whether Mr. Doss's explanation for his physical state was plausible, Sergeant Mangelson responded that "[t]here's a definite difference between someone who is tired and someone who is impaired, and in my opinion on that day Mr. Doss was impaired."  (<u>Id.</u>)

*Sergeant Mangelson Investigates Whether Mr. Doss Is Impaired*

Based on his suspicion that Mr. Doss was driving under the influence, Sergeant Mangelson asked Mr. Doss to get out of the truck to "see how [Mr. Doss was] navigating."  (<u>Id.</u>

3

at 15; Gov. Ex. 1.)  Sergeant Mangelson then performed a field sobriety test on Mr. Doss, termed

the "lack of convergence" test.  (Tr. at 15.)  That test measures an individual's ability to track an

object in a certain manner with his or her eyes.  (Id. at 7.)  If the subject's pupils fail to track the

object and then drift uncontrollably to the side, the test indicates marijuana use by the subject.

(Id.)  Sergeant Mangelson testified that when he performed the test, asking Mr. Doss to track a

pen, "[t]here was a very obvious reaction.  The pupil floated off, telling me that he's probably

using marijuana."  (Id. at 15-16.)  Additionally, while conducting that test, Sergeant Mangelson

once again commented on Mr. Doss's eyes and noted that Mr. Doss had "cotton mouth," both of

which he knew to be indicators or marijuana usage.  (Id. at 16.)

 After performing the lack of convergence test, Sergeant Mangelson asked Mr. Doss if he

had been using drugs and also inquired whether Mr. Doss had drugs in the vehicle.  (Id. at 17.)

Mr. Doss responded in the negative and then refused Sergeant Mangelson's request to search the

truck.  (Id.)  Sergeant Mangelson then asked Mr. Doss to sit in the front seat of the patrol car

while he radioed his dispatcher and requested Mr. Doss's driving status and criminal history.  (Id.

at 18-19.)  While sitting next to Mr. Doss in the patrol car and awaiting the information from

dispatch, Sergeant Mangelson detected and commented on the odor of marijuana emanating from

Mr. Doss.  (Id.)  Having encountered marijuana and marijuana users on numerous occasions,

Sergeant Mangelson testified that he was very familiar with the odor.  (Id. at 10.)  While in the

patrol car, Sergeant Mangelson also noticed a green film on Mr. Doss's tongue, which he

testified is another indication of marijuana use.  (Id. at 21.)

 Eventually the dispatcher related to Sergeant Mangelson that Mr. Doss had two prior

convictions for driving under the influence.  (Id. at 19.)  Mr. Doss misunderstood the dispatcher,

believing that she had indicated the presence of an outstanding  warrant.  (Id. at 20).  Mr. Doss's

inability to comprehend the dispatcher's report further contributed to Sergeant Mangelson's belief that Mr. Doss was impaired.  (Id.)

Thereafter, Sergeant Mangelson had Mr. Doss perform three additional field sobriety tests: the finger to nose test, the one leg stand, and the heel to toe test.  (Id. at 21-22.)  Mr. Doss's performance on those tests also indicated impairment, including compromised motor skills and lack of balance.  (Id.)  After performing the final three field sobriety tests, Sergeant Mangelson arrested Mr. Doss for driving while under the influence of a controlled substance.  (Id. at 22.)

*The Methamphetamine*

Sergeant Mangelson searched Mr. Doss's truck after placing Mr. Doss in custody and inventoried its contents.  (Id. at 22-23.)  While searching the console of the truck, Sergeant Mangelson located a user quantity of marijuana and a pipe used to smoke marijuana.  (Id. at 24.) He also located a duffle bag containing additional marijuana, some methamphetamine, a device used to ingest methamphetamine, and a set of scales commonly used by drug distributors to portion out user quantities of drugs.  (Id. at 26.)

On the back seat of the truck, Sergeant Mangelson found a stuffed Winnie the Pooh bear. (Id. at 24.)  When he picked up the bear, he immediately noticed that the bear was much heavier than one would expect.  (Id.)  Having previously discovered controlled substances concealed in stuffed animals, Sergeant Mangelson examined the bear and noticed that the stitching on the back had been removed.  (Id. at 24-25.)  From these observations, he concluded that something was concealed inside the bear.  (Id. at 25.)  Further investigation of the bear resulted in Sergeant Mangelson's discovery of approximately 4.5 pounds of methamphetamine, wrapped in duct tape, within the bear's stuffing.  (Id.)

*The Charge*

In a one-count indictment, the United States charged Mr. Doss with possession of methamphetamine with the intent to distribute.  (Indictment, dkt. # 5.)  Mr. Doss now requests an order prohibiting the United States from introducing into evidence the methamphetamine discovered by Sergeant Mangelson, arguing that Sergeant Mangelson discovered the methamphetamine only after impermissibly expanding the scope of the initial traffic stop.

ANALYSIS

Because a traffic stop impinges on a driver's Fourth Amendment rights, "[a]s a general rule, once an officer's purpose in a traffic stop based on probable cause or reasonable suspicion is complete, the officer must let the person go." United States v. Ozbirn, 189 F.3d 1194, 1199 (10th Cir. 1999) (citing United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)).  The scope of the detention must be carefully tailored to the underlying justification for which the driver was stopped.  See Florida v. Royer, 460 U.S. 491, 500 (1983).  Generally, in a routine traffic stop, an officer may detain persons for only as long as it takes to request an operator's license, vehicle registration, run necessary computer checks, and issue a citation.  See United States v. Martinez, 983 F.2d 968, 974 (10th Cir. 1992).  "If the driver produces a valid license and proof he is entitled to operate the vehicle, he 'must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'" United States v. Miller, 84 F.3d 1244, 1250 (10th Cir. 1996) (citing United States v Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)), overruled on other grounds by United States v. Holland, 116 F.3d 1353 (10th Cir. 1997).

But an officer is not required to simply turn a blind eye to new information lawfully gained during the course of an otherwise routine traffic stop.  See United States v. Villa-

Chaparro, 115 F.3d 797, 801 (10th Cir. 1997). Rather, "[a]n investigative detention may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id. (internal citation and quotation omitted).

In determining the reasonableness of an officer's suspicion, the officer's conduct should be viewed with "'common sense' considering 'ordinary human experience,'" id. (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)), an approach "intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions," id. (quoting United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995)); see also United States v. Arvizu, 534 U.S. 266, 272 (2002) (the totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them").

Mr. Doss does not challenge the permissibility of his initial stop for speeding. Rather, Mr. Doss challenges the constitutionality of Sergeant Mangelson's decision to expand the scope of the traffic stop to include an inquiry into whether Mr. Doss was driving while impaired. Therefore, the court must determine whether Sergeant Mangelson possessed a reasonable suspicion that Mr. Doss was impaired at the moment that Sergeant Mangelson first suggested that Mr. Doss may have been drinking and asked Mr. Doss to exit the vehicle for a field sobriety test. In making that determination, the court must grant appropriate deference to Sergeant Mangelson's training and expertise in an effort to "avoid unrealistic second-guessing" of his decision to investigate whether Mr. Doss was driving impaired. See Villa-Chaparro, 115 F.3d at

801.

The record evidence shows that Sergeant Mangelson expanded the scope of the traffic stop almost immediately after first making face-to-face contact with Mr. Doss.  Sergeant Mangelson, when initially speaking with Mr. Doss through the passenger-side window about the reason for the traffic stop, commented on Mr. Doss's eyes and asked if he had been drinking only moments after beginning the conversation.  (See Gov. Ex. 1.)  Sergeant Mangelson testified that upon speaking with Mr. Doss, he immediately noticed that Mr. Doss (1) possessed a detached, zombie-like look; (2) had glassy, pink, bloodshot eyes; and (3) was extremely nervous.  (Tr. 12-14.)  The videotape of the traffic stop additionally shows that Mr. Doss was speaking quite rapidly.  (See Gov. Ex. 1.)  Sergeant Mangelson testified that each of these observations is consistent with the conclusion that Mr. Doss was impaired.  (Tr. 12-14.)

Mr. Doss argues that each of Sergeant Mangelson's observations are susceptible to varying interpretations--interpretations consistent with Mr. Doss's contention that he was merely tired after a poor night's sleep--and that those observations, even when considered in their totality, did not supply Sergeant Mangelson with reasonable suspicion to investigate whether Mr. Doss was impaired.

In advancing his argument, Mr. Doss relies primarily upon United States v. Wald, 216 F.3d 1222 (10th Cir. 2000), which involved another traffic stop conducted by Sergeant Mangelson.  In Wald, Sergeant Mangelson conducted a search of the trunk of a vehicle that he initially stopped after noticing that the car had a cracked windshield.  Id. at 1224-25.  The district court concluded that Sergeant Mangleson had probable cause to search the car's trunk after he detected the smell of burnt methamphetamine in the passenger compartment of the car, noted that the defendant had "bloodshot and glassy eyes," and when both occupants of the car appeared to

8

be extremely nervous.  See id.  The Tenth Circuit reversed the district court, stating that "[i]n undertaking probable cause determinations, this court recognizes that some facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." Id. at 1227.  The Wald court indicated that "the appearance of Wald's eyes . . . fall into that category."  Id.  The court went on to state that nervousness too "is of limited significance in determining whether probable cause to search the trunk existed."  Id. (internal quotation omitted).

Mr. Doss's reliance on Wald is misplaced because the nature of the governmental intrusion in Wald was distinct from that at issue here.  Wald addressed the permissibility of a search of the trunk of a vehicle and not the permissibility of the brief detention of a possibly impaired driver.  As a result, in Wald, the Tenth Circuit's discussion of Sergeant Mangelson's observations were focused exclusively on whether those observations provided Sergeant Mangelson with probable cause to search the trunk of the defendant's car.  Here, the court is faced with an entirely different inquiry: whether Sergeant Mangelson's observations provided him with reasonable suspicion to detain Mr. Doss to investigate the possibility that Mr. Doss was driving while impaired. The United States Supreme Court has placed great emphasis on balancing "the need to search (or seize) against the invasion which the search (or seizure) entails" when determining whether a particular governmental intrusion is lawful.  Terry v. Ohio, 392 U.S. 1, 21 (1968); see also Delaware v. Prouse, 440 U.S. 648, 654 (1979) ("The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.").  Quite simply, observations about a driver's eyes and general physical state may be sufficient to justify a brief, relatively unintrusive, investigation into possible impairment but not sufficient to

establish probable cause to open the trunk of a driver's car.

The court notes that in Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977), the United States Supreme Court held that an officer may order a detained motorist to exit a vehicle during a routine traffic stop.  See id. ("We think that this additional intrusion[, the request to exit the vehicle,] can only be described as de minimis.").  Accordingly, even if Sergeant Mangelson did not suspect that Mr. Doss was impaired, he could have ordered Mr. Doss to exit the vehicle without running afoul of the Fourth Amendment.  But Sergeant Mangelson did suspect that Mr. Doss was impaired and the court concludes that Sergeant Mangelson's request that Mr. Doss briefly attempt to keep his eyes on a pen while standing by the roadside was not unreasonable, but rather provided a relatively unintrusive means by which he could either confirm or allay his suspicion.

Additionally, while the Tenth Circuit has appropriately cautioned that nervousness "is of limited significance in determining reasonable suspicion," and that such evidence "must be treated with caution," United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994), it has not stated that evidence of nervousness is of no significance.  Sergeant Mangelson testified that Mr. Doss was extremely nervous, much more so than the typical driver.  The Tenth Circuit has held that while courts should be wary of evidence of nervousness, "extreme and continued nervousness is entitled to somewhat more weight." United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001) (internal quotation omitted).  A review of the videotape does show that Mr. Doss exhibited signs of nervousness.  But the level of nervousness observed by Sergeant Mangelson does not appear to approach that of the defendant in Williams, who was visibly shaking and twitching during his encounter with law enforcement.  See id.  The court concludes therefore, based on Sergeant Mangelson's testimony and the videotape of the traffic stop, that

Mr. Doss's nervousness is entitled to some, but only limited weight.

Nevertheless, the court concludes that Sergeant Mangelson possessed a reasonable, articulable suspicion that Mr. Doss was driving while impaired.  That reasonable suspicion was sufficient to justify Sergeant Mangelson's question to Mr. Doss concerning possible drinking, as well as his request that Mr. Doss exit the vehicle and perform a field sobriety test.

Although Mr. Doss's challenge does not extend beyond the initial expansion of the scope of the traffic stop, the court concludes that Sergeant Mangelson's subsequent investigation was adequately justified at each stage.  Mr. Doss performed poorly on the lack of convergence test, indicating that he had used marijuana.  Mr. Doss's poor performance justified Sergeant Mangelson's questioning regarding drug use and possession.  At that point, Sergeant Mangelson's decision to run computer checks on Mr. Doss's license and registration were more than justified.  See Martinez, 983 F.2d 968, 974 (10th Cir. 1992) (stating that an officer performing a routine traffic stop is entitled to run necessary computer checks).  While running those checks, Sergeant Mangelson detected the odor of marijuana and noticed a green film on Mr. Doss's tongue.  Sergeant Mangelson then performed additional field sobriety tests on Mr. Doss, the results of which indicated that Mr. Doss was impaired.

The totality of that evidence all contributed to Sergeant Mangelson's decision to arrest Mr. Doss for driving under the influence of a controlled substance.  The evidence before this court establishes that Sergeant Mangelson's investigation into Mr. Doss's potential impairment was supported, at a minimum, by reasonable suspicion throughout, and that probable cause supported Sergeant Mangelson's eventual arrest of Mr. Doss.  As a result, Mr. Doss's Motion to Suppress is DENIED.

DATED this 18th day of May, 2006.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge